### UNION CARBIDE CO. v. AMERICAN CARBIDE CO.

(Circuit Court, N. D. New York. August 2, 1909.)

PATENTS (§ 328*)—INFRINGEMENT—PROCESS OF PRODUCING CALCIUM CARBIDE.
　　The Willson patent, No. 563,527, for a process of producing calcium carbide by subjecting lime and a carbonaceous deoxidizing agent to the heat of an electric arc in an electric furnace, construed, and *held* not infringed.

　　[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit originally to restrain alleged infringement and for an accounting; but, the patent having expired soon after suit brought, there can be an accounting only in case the patent is held valid and infringed.

Dickerson, Brown, Raegener & Matty (S. L. Moody, of counsel), for complainant.

Kernan & Kernan (Charles Neave and Willis Fowler, of counsel), for defendant.

RAY, District Judge. The patent having expired since suit brought, there can be no injunction, but an accounting only. As a cause of action for alleged infringement was stated in the bill filed, and the patent had not then expired, this court denied a motion to dismiss the suit and retained jurisdiction.

The patent in suit was granted to Thomas L. Willson July 7, 1896, on application filed March 16, 1893. The patent is numbered 563,527, and is for new and useful improvement in the production of calcium carbide, to wit, "the process of producing said calcium compound, generally known as calcium carbide." The application was filed shortly after Willson discovered or invented the process claimed, and, as seen,

was pending in the Patent Office about three years. The patent has two claims, claim 1 being in issue here, and that reads as follows:

"1. The herein-described process of producing a calcium compound, which consists in subjecting mingled lime and a carbonaceous deoxiding agent to the heat of an electric arc in an electric furnace, the carbonaceous matter being in excess of that required to combine with the free oxygen, whereby the liberated calcium combines with the excess of carbon to form a calcium carbid, substantially as described."

As claimed, the process consists in: (1) Subjecting mingled lime and a carbonaceous deoxidizing agent to the heat of an electric arc in an electric furnace; (2) the carbonaceous matter being in excess of that required to combine with the freed oxygen; and (3) whereby the liberated calcium combines with the excess of carbon to form a calcium carbide substantially as described.

In the specifications Willson is more definite and specific as to his process, and says:

"I take finely divided calcium oxid or lime, which may be anhydrous, and finely divided carbon in about the proportions of thirty-five per cent. of carbon and sixty-five per cent. of lime, and, having mingled them thoroughly together, subject them to the action of an electric arc in a furnace. This electric arc must be of sufficiently definite character to be distinguished from the mere heat of incandescence, which is no part of this invention. The reducing agents which I employ are preferably carbon in the form of coke, but hydrocarbons may be employed in admixture with the lime and coke, or the lime may be saturated with a liquid hydrocarbon. The electric furnace is preferably of the kind having a carbon or graphite crucible or hearth connected to one terminal of a suitable dynamo, and a carbon pencil connected to the opposite terminal thereof, and the carbon and calcium oxid are fed into the polar interspace.

"To start the operation, the carbon pencil should be in contact with the crucible or hearth, or so close to the same that a current of electricity may pass. After establishing the current the carbon pencil is lifted so as to strike an arc, and during the process this arc is maintained by keeping the pencil sufficiently lifted to maintain a space between it and the conductor beneath. The intense heat of the arc decomposes the lime, the oxygen combining with the carbon, forming a carbon monoxid or dioxid, which escapes in gaseous form, while the calcium, or the greater part of it, combines with the carbon, forming a calcium carbid."

The patentee states:

"I am aware of the patent to Cowles of June 9, 1885, for electric furnace; but this furnace does not operate by an arc passing in contact or close proximity to a mass of finely divided carbon and lime, and therefore does not carry out the process of this invention. It is furthermore important to have an excess of carbonaceous matter over that necessary to unite with the oxygen, so as to enable the calcium to unite with such excess of carbon. I do not in this application claim the making of metallic alloys by alloying the metal of an electrode with the metal of a bath in an electric furnace."

It is self-evident, I think, that this process is limited to the use of the electric arc in an electric furnace and includes the electric arc as then understood and existing with all improvements thereon. The patentee and his assigns could not be deprived of the benefit of the invention by improving either the electric arc or changing the form thereof. At the time of the invention two types of electric furnace were known and recognized, viz., the arc furnace and the incandescent furnace. In the arc furnace we have a gap or space between the

terminals or electrodes. This space or gap is, so to speak, bridged by a vapor or gas which interferes with the current and causes a very high heat at that point.

In the incandescent furnace we do not have this space or gap between terminals or electrodes, but in place of it some solid or fused body interposed between the electrodes and of a character to offer much greater resistance to the passage of the current than does the rest of the circuit or conductor. At this point therefore great heat is generated, or the interposed body becomes heated to incandescence or glowing heat. We have therefore the solid electrodes, the current of electricity, primarily the gap or space, and lastly the body interposed between the electrodes interfering with the current, offering resistance, and thereby causing the intense heat at that point. Which interposed body, assuming other conditions to be equal, offers the greater resistance? If it be the arc type of furnace where the space is bridged by a gas or vapor, then the heat at that point will be greater in the arc furnace than in the incandescent furnace. There are other minor differences between the two types of furnace. It is claimed that in the arc furnace the energy is liberated in an arc gap of a few inches in length, while in the incandescent furnace the same amount of energy is liberated from a comparatively large area; that this is made necessary for the reason that in the incandescent furnace the incandescent resistance body must be of comparatively great length.

The defendant insists that it uses neither the arc furnace nor the incandescent furnace as they existed at the date of the patent in suit nor an improved type or improvement thereof, but a new type of furnace, the result of discovery and progress in the electric art. It is well known in the art that the character of resistance to the passage of the current may be comminuted or pulverized material. In other words, it is not necessary that the space between the electrodes be "bridged" (using that expression) for the passage of the electric current by a solid or fused body which is heated to incandescence and then radiates or communicates the heat to the surrounding material, provided the principle of the arc is absent, and such space is not bridged by the vapor or gas which does not become heated to incandescence. In either type of furnace the material to be treated is brought in contact with the heat, or the heat with the material. The intense heat decomposes the lime, and the oxygen combines with the carbon, forming a carbon monoxide or dioxide, which escapes in a gaseous form, while, if the heat and proportions of material be proper and sufficient, the calcium, or most of it, combines with the carbon forming a calcium carbide.

The claim of the patent in suit is plainly and distinctly limited to the use of "an electric arc in an electric furnace." The process "consists," says the claim, in subjecting mingled lime and a (any) carbonaceous deoxidizing agent to the heat of an electric arc in an electric furnace. This is emphasized by the specifications, which say:

"I take * * * and, having mingled them thoroughly together, subject them to the action of an electric arc in a furnace. This electric arc must be

of sufficiently definite character to be distinguished from the mere heat of incandescence, which is no part of this invention."

In short, Willson expressly excludes the heat of incandescence and the incandescent electric furnace as he had to do in view of the prior art. He also says:

"The intense heat of the arc decomposes the lime."

Also:

"I am aware of the patent to Cowles of June 9, 1885, for electric furnace; but this furnace does not operate by an arc passing in contact or close proximity to a mass of finely divided carbon and lime, and therefore does not carry out the process of this invention."

It is observed that Willson does not say or intimate that the Cowles furnace does not operate by or use the arc, but that it does not operate by "an arc passing in close proximity to a mass of finely divided carbon and lime, and therefore does not carry out the process of this (Willson's) invention."

One cannot read the Cowles patent of June 9, 1885, No. 319,795, without being impressed with the fact that the process is neither arc nor incandescent strictly, especially as heretofore described. However, there is an interposed substance which is mixed in a way with the material to be treated, and which interposed substance acts as a conductor of the current while also offering resistance to its passage and consequently becoming heated to iridescence. This substance is not a gas or vapor, but "a body of granulated material of high resistance or low conductivity interposed within the circuit in such a manner as to form a continuous and unbroken part of same, which granular body by means of its resistance is made incandescent and generates all the heat required." This body of granulated material may consist of, or as described and the preferred agent consists of, "electric-light carbon as it possesses the necessary amount of electrical resistance and is capable of enduring any known degree of heat when protected from oxygen without disintegrating or fusing." Crystalline silicon or other equivalent of carbon can be employed for the same purpose, says Cowles. This is pulverized or granulated; the degree of granulation depending upon the size of the furnace. Cowles also says that in a large furnace and a powerful current this interposed substance of high resistance or, what answers the same purpose, of low conductivity, "may pass beyond what is ordinarily understood by the term granular and be, in fact, pieces of carbon of considerable size." By the Cowles process, as he understood it, these granular pieces or atoms of carbon became incandescent, and the heat was thus generated and communicated to the surrounding material. This interposed material was usually mixed with the material to be reduced or treated. The patent says:

"The ore or light material to be reduced—as for example— * * * is usually mixed with the body of granular resistance material and is thus brought directly in contact with the heat at the points of generation at the same time the heat is distributed through the masses of granular material, being generated by the resistance of all the granules and is not localized at one point or along a single line."

In short, we would have a suitable receptable for the materials to be reduced and the granular substance, all mixed together, with an electrical current one pole or terminal above and the other below, the lower one being in the floor of the receptacle and the upper one coming near to but not reaching it, and the interposed mixture will fill the space and make the circuit continuous, but offer the necessary resistance and generate the necessary heat by heating the granulated particles to incandescence and so, of course, communicating the heat to the material mixed with and surrounding them.

Now, how does the Willson furnace operate? As shown by the quotation given from the patent in suit, he has a suitable receptacle for the material to be reduced or operated on, the two poles or terminals one above and one below; the one reaching the base of the receptacle, and the other, affixed to a carbon pencil, coming near to it. The material to be reduced "is fed into the polar interspace." At first the carbon pencil is in contact with the base of the receptacle, but so soon as the current is established the pencil is lifted so as to strike an arc, and this arc is maintained during the operation. As matter of course, the passing current, passing the bridge, goes into the material filling the "polar interspace"; but it is this obstruction that generates the heat in or from the circuit, and it would seem to be done in the immediate presence of and to act directly on the material to be reduced, and not by radiation from some other substance heated to incandescence. This differs from the operation of the Cowles patent or process. The one would seem to belong to the arc type, and the other to the incandescent type, of furnace and mode of operation. When the arc is formed or set in operation, the electrodes are substantially brought in contact in the arc process, whether it be for heating or for lighting. This is done to establish the continuity of the current; but, once established, the electrodes may be gradually separated, within a limit, and maintained in that position. The arc is formed or established when this separation takes place. As the current passes, or jumps the space, or crosses the bridge, being obstructed, the great heat is generated, and as the light therefrom took the form of an arc it was given that name. If Willson bridges the space with some gas or vapor, as Mr. Tone, complainant's witness, says it is done, and such gaseous vapor fills the space and carries the current, and the material to be operated on, carbon and calcium oxide (named in the patent), are fed into the polar interspace, it must be that they intermingle, and it must be that the gas or vapor is intensely heated, and there is little difference in the processes, save intensity of heat and the character of the material forming the bridge, a gas in the one case, and granulated carbon in the other.

Turning to the file wrapper of the patent in suit, we find that Willson at first claimed all electric furnaces, and expressly stated that, while he preferred the arc and arc heat, that of the incandescent type was sufficient. Being rejected on Cowles and the prior art, he finally limited himself to the arc type, as described, and was then rejected; but a new or amended claim was finally allowed, as found in the patent. It follows that the claim is to be strictly construed and is confined to the arc furnace as described.

Claim 2 of the original application read:

"2. The described process of producing a calcium compound consisting in subjecting quick lime and a deoxidizing agent to intense heat in an electric furnace."

Claims 3 and 4 referred only to "an intense heat in an electric furnace." In the specifications he said:

"The furnace, preferably an electric arc furnace, although an incandescent furnace might be employed. The intense degree of heat that is only to be attained by connecting electrical energy with heat energy seems to be necessary to insure the necessary reaction."

In a communication to the Patent Office of February 23, 1894, in amending the claims, etc., the attorneys for Willson said:

"Mr. Willson's present invention resides not so much in the mode of operation as in the material upon which that operation is performed, whereby a hitherto unknown product is produced."

Coming to the defendant's process, we find, according to the witnesses Tone and Morehead, that defendant uses an electric furnace; but there is a contention and sharp dispute as to whether it is the arc furnace or of the incandescent type. It is described by Tone as having a base plate with the lower electrode consisting of a short round carbon block set therein, an upper electrode, so arranged as to be raised or lowered, consisting of 2 lengths of graphitized carbon, each 5½ inches in diameter and 36 inches long and spliced together by a threaded joint and giving a total length of about 6 feet. This is inclosed in a water jacket, but leaving the lower end of the electrode bare for about 20 inches. There is a suitable casing, a gas outlet, and an opening for charging. Morehead thus describes them:

"There were eight furnaces in all. There was a structure made of concrete, probably reinforced, that had an opening in front. I am describing one furnace now. They were all similar. This opening extended from the floor to the top of the concrete structure. The top of the opening was closed by a sheet-iron door. There were two rails leading into the compartment on which a truck could run in and out of the furnace. There was a truck for conveying the crucibles into and out of the furnaces. The crucibles consisted of a cast-iron sole plate some 30 inches in diameter by about 2½ inches thick. This rested on the truck and had lugs for the purpose of making electrical contact. There was a rim on the top of this sole plate for holding the side of the crucible. In the middle of the sole plate there was a hole into which was fitted a carbon plug. This plug was about 8 inches in diameter and stood up about 3 inches above the surface of the sole plate. There was a sheet-iron side to the crucible which was detachable. This was made of about quarter-inch iron or steel, was circular in cross-section, was provided with lugs at the bottom for attaching it to the sole plate, and hooks at the top for moving it. It was perforated to allow of the escape of gas. This circular side, the sole plate, and the truck were designed to move into and out of the furnace compartment made of concrete and mentioned above. Copper conductors were connected to the sole plate to make electrical contact. On the top of the structure, which was some 8 feet high, there was a stationary hopper for holding the mixture and a movable bin which was removed from time to time by a crane, filled with mixture, and replaced. This bin connected with the stationary hopper, which was connected by a chute to the crucible. There was a take-off pipe for gas in the top of the compartment, and coming through the top of the compartment over the center of the crucible below was a movable electrode which consisted of carbon pencils about 6 inches in diameter by about 4 feet long. These were held by a clamp and ran through a water jack-

eted pipe into the furnace. The lower end of the pencil projected below the end of the water jacket and conducted the current into the crucible. The ends of the carbon electrodes or pencils were threaded so as to have new pencils connected as an old one would burn off. The upper electrode was suspended and designed to permit of movement in a vertical direction. It was connected by cables to a device designed for raising and lowering the pencil."

Assume, as I now do, a proper connection with a suitable dynamo and transformer, the use of lime and coke, or lime and a suitable carbonaceous deoxidizing agent, there being the proper excess of the carbonaceous matter, is this lime, mixed or mingled with the carbonaceous deoxidizing agent, mixed with any other substance which bridges the interpolar space, the space between the electrodes when separated after the current is established so as to act as a conductor, at the same time offering the necessary resistance to generate the heat, and does this conducting material, having low conductivity, become incandescent and radiate or communicate the heat to the surrounding material to be reduced? If so, defendant is within the prior art and protected thereby. To infringe the defendant must use not only the material, lime, and carbon, in a mixture, that of the patent in suit, but defendant's furnace must heat it, reduce it, produce the necessary reaction; by the heat of an electric arc furnace as distinguished from an electric incandescent furnace. The heat must come from the arc itself, a space between the positive and negative poles, or the two electrodes, filled with a gaseous vapor which, while having low conductivity, is, of course, heated if not incandescent. When some substance, even if broken into particles, which acts as a conductor, fills the space between the electrodes and becomes incandescent, and the heat is thence conveyed to the substances, or charge to be treated, or reduced, even if it be the material to be reduced or operated on itself, we no longer have the arc or its principle, although we may have a multitude of very small arcs struck or created by the passage, or jumping, of the divided current from particle to particle of the interposed substance or substances. This, undoubtedly, was the action of the Cowles patent. There may be slight or imperfect union between the particles or materials acting as the conductor, the generation of gas, and a passing of current in this way, as well as directly from particle to particle of the material.

The arc furnace, within the meaning of the claim in question of the patent in suit, must be one where the current is carried from electrode to electrode through an open space by some gaseous vapor, and not one where the current is carried by some other substance offering resistance, being of low conductivity and to some extent by means of the very small but multitudinous arcs formed in the manner indicated at many points in the material fed into the furnace. If the materials used by defendant to form the charge carry the current, or the main part of it, and offer the resistance, and fill the space between the electrodes while being transformed, or while the main part is being transformed or reduced, then we have no arc within the meaning of the claim of the patent in suit. In that case we do not have the principle of the arc or derive the heat from an arc; but the furnace acts on the incandescent principle, although, perhaps, not as generally practiced

and understood in 1893 or 1896. The incandescent electric furnace is thus described in the Encyclopedia Americana (vol. 6, "Electric Furnaces") :

"The Incandescent Furnace.—This term is commonly applied to those furnaces wherein the heat is developed by the passage of the current through a body which initially at least is solid. Such body may comprise a rod or core of carbon or carbonaceous mixture; a granular bed or core consisting of fragments of coke, retort carbon or graphite: the charge itself, often admixed with a quantity of carbon sufficient for its reduction; the furnace product when this is conductive and possesses a volatilizing point sufficiently high to permit the necessary temperature to be attained; or a pyroelectrolyte, that is to say, an oxide or mixture of oxides which is normally nonconductive or substantially so, but which while remaining unfused becomes capable at temperatures considerably above the normal of carrying the current. Each of these resistance materials possesses its advantages for particular lines of work, but all have in common the advantage of permitting accurate and ready adjustment of the temperature by varying the amount of current passing. These incandescent furnaces have therefore the widest applicability, and in case the resistance material used is carbon the maximum temperature attainable is probably not inferior to that of the terminals of the electric arc. The above defined types are not always sharply distinct, but under certain conditions the operation proceeds under two or perhaps all three of the methods. Thus if the resistance consists of fragments of carbon, the current may traverse the interspaces in the form of minute arcs; and if this fragmentary carbon be commingled with a suitable ore or compound, there may be present also an electrolytic effect; the primary fusion of an electrolyte is often accomplished by means of a resistance rod connecting the electrodes, or this fusion may be accomplished by the arc. Furthermore a given furnace structure is often capable of either mode of operation according to the character of the charge and the adjustment of the electrodes with reference thereto."

The extent of Willson's limitation and his understanding of the arc furnace are shown by a quotation from his amendment of November 3, 1892, found in the file wrapper of patent No. 492,377, where he says, referring to the Cowles patent and to the effect, that there heat is radiated from "innumerable thermal foci" (and, in order to distinguish his process and his type of furnace), "applicant's process is an electric arc process wherein the heat is radiated from only one thermal focus, which is the arc itself." This shows clearly what Willson understood by the arc, what he understood the arc in a furnace to be, and it cannot be reasonably contended that the arc in one Willson patent is different from the arc in another. Here he has defined an electric arc furnace in this particular and made it one where there is but a single arc—a space between the electrodes bridged by gaseous vapor, and not by any solids, whether in one piece or in scores of pieces.

Defendant's witness Crocker visited defendant's plant and carefully examined its furnaces and their mode of operation. He says:

"On these occasions, I observed the starting, running, and stopping of a number of defendant's furnaces, as the work was being carried on in the regular way. In one instance, I observed the entire operation of a furnace from the first starting of it until the operation was completed and the current interrupted. I also saw the carbide and unconverted mixture dumped from the furnace and saw the ingot cleaned and weighed. I am confident that the work was carried on in the usual commercial manner, because the plant was running at full capacity, the furnaces being continually operated—that is, charged up as soon as a previous operation had been completed—and a number of men were busily engaged in tending the various furnaces. Most of the

men were common workmen, who were incapable of doing what I saw them do, unless they were accustomed to their work by considerable routine. Furthermore, the output of the furnaces, including the one which I observed particularly, was normal in amount and quality. My observations therefore covered the regular operation of defendant's furnaces and plant generally.

"The furnace consists of a practically flat horizontal hearth or bottom, mounted on a four-wheeled truck. The lower electrode composed of carbon is fixed in the center of this furnace bottom. Flexible copper cables are connected to the cast-iron bottom, in order to supply electric current to the lower electrode. The upper electrode is a vertical carbon rod, about 5½ inches in diameter, carried by a cast-iron water jacket which acts as a holder, from which the electrode projects downward nearly 2 feet. This electrode is adjustable vertically, that is, raised or lowered, as desired, in order to control the current within proper limits and to carry on the operation in an efficient manner. The mixture of lime and coke treated in the furnace is contained in a cylindrical sheet-iron shell, which stands vertically upon the furnace bottom or hearth, to which I have referred. This shell is often called technically the 'crucible,' because it, together with the hearth, may be regarded as constituting a crucible, which takes the place on a larger scale of the actual crucible employed, in the earlier electric furnaces, as, for example, in the Siemens furnace, which I described in my answer to Q. 5. In fact, defendant's furnace is substantially the same in its construction as the Siemens furnace, including the crucible, fixed lower electrode, and vertically movable upper electrode. The operation of defendant's furnace, however, is on the incandescent principle; the formation of an arc being carefully avoided.

"In order that I might observe more fully and more clearly the exact conditions of operation in defendant's furnaces, I had one of them started and run for some time with the shell or crucible removed, so that the upper electrode and the material were entirely open. In order to study carefully and compare the arc condition of operation with the incandescent condition of operation of the electric furnace, I purposely caused the arc to be formed and maintained, by raising the upper electrode sufficiently to establish the arc and continue it. In observing the action of the furnace, I put on darkened glass goggles to protect the eyes from the light, which was intense in some experiments, and was thus able to see clearly what was going on. I also made a number of definite quantitative tests with electrical measuring instruments, in order to obtain further information regarding the phenomena and electrical conditions involved in the operation of electric furnaces. All the results and conclusions derived from my tests and observations demonstrate conclusively that the conditions and phenomena are radically different when the arc is purposely formed and maintained, compared with the conditions and phenomena that exist when defendant's furnace is run normally, according to the incandescent principle. I have found at least eight positive differences between the 'arc' and 'incandescent' conditions of operation, and I will now point out these differences. * * *

"The very conditions of operation of defendant's furnaces absolutely preclude the forming or maintaining of an arc in normal operation. The mixture of lime and coke is fed into the furnace until the upper electrode is covered to a depth of about 10 or 12 inches. This material is fed in from a hopper above the furnace and fills in all around and in contact with the upper as well as lower electrode. Under these circumstances, the arc is and must necessarily be completely smothered and extinguished. The coke of the mixture is a conductor at all temperatures, and the lime becomes a conductor as soon as it is heated, which occurs very quickly in the high temperature of the electric furnace. This conducting mixture therefore, in contact all around the upper electrode, which is about 5½ or 6 inches in diameter and covered by the mixture to a depth of about 10 or 12 inches, must necessarily make electrical connection and carry the current which instantly avails itself of a solid conducting path in preference to the arc space or gap, which is a poor conductor. Not only is the material fed around and in contact with the electrode to a considerable depth, as I have stated, but it is also a fact that the workmen tending the furnaces continually poke the material up to, and in close contact with, the upper electrode, thus insuring electrical connection through which

the current flows; this being a path of much less resistance than that afforded by the arc.

"It is practically self-evident to any one having even moderate knowledge of electricity that the presence of conducting material in contact with both electrodes will cause the current to pass through that material in preference to jumping across the arc space. It is hardly necessary to corroborate such a self-evident matter; but I cite the statement of Willson himself, the patentee of the patent in suit, in his patent No. 491,394, defendant's Exhibit AQ, as follows: 'In case the material to be reduced is either itself a sufficiently good conductor, or is so intermixed with a good conductor as to afford a sufficient conducting path around the arc (as in case granulated carbon of sufficient conductivity is commingled with it in sufficient proportion), the material must not be permitted to remain in contact with the pencil to such an extent as to afford so good a conducting path around the arc as to extinguish the arc.'"

It is quite clear that the filling in of the material between the electrodes to the depth defendant does would extinguish the single arc when used to start the operation of reducing the material to be filled in, and that defendant relies on the low conductivity of the material itself, the coke, carbon, and lime, all of which defendant uses if complainant's evidence is to be relied on, and the multitude of small arcs formed in the manner before pointed out, and which was and is characteristic of the Cowles process. It must be kept in mind that there has been a vast addition to electrical knowledge since the patent in suit was applied for and granted, and that, in view of Cowles, the patent in suit was granted only after the express limitation placed thereon, and the extent of which, so far as references and quotations are concerned, is herein only outlined. One, at least, of complainant's witnesses, says that the movable electrode is characteristic of the arc furnace. I think, on the evidence, it is characteristic of both the arc and the incandescent furnaces, of the one no more than the other. It was used by Cowles and described by him in his patent of January 26, 1886, for "electric furnace and method of operating same," No. 335,-058. He says:

"This invention relates to electrical smelting furnaces operating on the incandescent principle, in which metallurgical operations requiring an intense heat are carried on, with electricity as the heat-producing agent. This invention consists in the improved method of operating incandescent electric furnaces herein described, and in the combination, with a furnace containing a charge of electrical resistance material, of two movable electrodes situated at opposite ends of the furnace, and projecting into the body of the charge contained within it, so that the said electrodes may, when the resistance runs down, be drawn apart, thereby increasing the amount of the charge between the electrodes, and consequently increasing the resistance, and thus preserving a uniform resistance within the furnace. The invention also consists in the arrangement of suitable mechanism actuated by the current or a portion of the same for automatically moving the electrodes, so as to govern the amount of energy utilized in the furnace."

The Cowles furnace, to my mind, was as much of an "embedded arc" as is defendant's. If that was and is an "embedded arc," then it was disclaimed by Willson in order to get his patent in suit. He clearly and definitely and positively disclaimed the furnace of that type; one carrying the current from electrode to electrode through or by means of broken masses of material having (some of it) low conductivity and producing or striking a multitude of small arcs as the current leaps from particle to particle because of the imperfect union,

or otherwise. In such case the current does not pass around one single arc, but passes by many bridges from electrode to electrode.

It is obvious that the operation of the arc has some distinguishing characteristics; but the one that controls is the existence of the one arc through which the current passes and where the intense heat is generated, as distinguished from a composition acting as a resistance and as a conductor wherein or whereby, in addition to the direct current, a multitude of small arcs are struck, as must have been the case with Cowles, although perchance he did not understand it. When a quantity of material to be operated on is filled into the so-called "crucible" above and covering the lower electrode, and the upper electrode is above such material, this upper electrode can be made to move from point to point above the charge, and the intense heat of the arc formed between the upper electrode and such material applied at different points or the electrode can be stationary, and the material or charge made to pass beneath it. When this is done, we, of course, have the arc pure and simple, and I think this was the process Willson had in mind. It is, of course, true that if in defendant's furnace the arc formed, when it is first started, remains, and all the material coming within its direct range or influence is immediately dissolved and melts away, as complainant claims, so that the current is carried by the gaseous vapor between the electrodes, such arc having, of course, quite a little diameter, the furnace acts on the arc principle, and not on the incandescent principle.

But, if so, of what use is the conducting material that does not enter into the product to any material extent? If the arc is formed and does the work of reducing the material, if it all melts, etc., and the surrounding material, as it is reduced, simply falls into the arc and at once drops to the bottom of the crucible, then we have no conductor except the gaseous vapor, and, in place of a solid material acting as a conductor or conductors, and a multitude of small arcs incidental to the use of the material, we have one large arc in the midst of the charge. If this be defendant's operation, then it uses an electrical arc furnace. The mere fact that it is an embedded arc does not change the fact, if it be a fact, that the furnace operates on the arc principle and is within the claim of the patent in suit. As I have said, I do not think or hold that the patent does not cover the arc furnace operating on that principle and in that way, if it be changed in form from the one in use when the patent was granted. I do not understand that the embedded arc has been patented.

I think the evidence establishes: (1) That the material used by defendant in his mixture, or some of it, acts as a conductor and is not a gaseous vapor; (2) that some of this material offering resistance and being of low conductivity becomes intensely heated to iridescence; (3) that, in addition, because of the imperfect union of this conducting material, innumerable small arcs are formed which aid in giving the heat; (4) that there is no single arc in the defendant's process, except at the very beginning and when the current is being established, and that this is very soon extinguished when the material is fed in filling the space between the electrodes and extending up around the carbon pencils forming the upper electrode; (5) that the

reducing of the material fed in and intended to be reduced is done mainly, but not wholly, by incandescence for the reason stated. Finally, I think it shown by the preponderance of evidence that defendant's furnace, on the whole, acts on the incandescent principle, and not on the arc principle, and must be termed an incandescent furnace, and therefore not within or covered by the limited claim in issue of the patent in suit.

It follows that the defendant does not infringe, and that the bill of complaint must be dismissed, with costs.